FILED
2020 May-19  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CHERRI WALKER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   5:16-cv-00506-HNJ |
| | ) | |
| LIFE INSURANCE COMPANY OF | ) | |
| NORTH AMERICA, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cherri Walker, asserts claims for breach of contract and bad faith against Defendant, Life Insurance Company of North America (LINA),[1] arising from

---

[1] The parties sometimes refer to the company that issued the relevant insurance policies as "Cigna," not "LINA."  The record does not clearly explain the relationship between the two entities, but the evidence generally portrays the two companies as interchangeable.  Melissa Smith, LINA's Claims Manager, testified "Cigna is affiliated with LINA, and to the best of my understanding they are one and the same."  (Doc. 125-7, at 5, 7, 8).  Walker attested that LINA was "also known as CIGNA Group Insurance ('Cigna')."  (Doc. 128-2, ¶ 2); *see also* Doc. 128-3, at 814-15 (counsel confirming the deponent's understanding that Cigna and LINA constituted interchangeable entities); Doc. 128-3, at 925 (same).  Importantly, LINA has not disputed Walker sued the correct defendant, and neither party has raised any other arguments related to the differences in the companies' names.  Because the distinction between Cigna and LINA does not appear to bear any legal significance in the context of this case, the court, like the parties, will consider the two entities interchangeably.  For convenience and clarity, and for purposes of this opinion only, the court will transcribe any reference to "Cigna" as a reference to "LINA."

LINA's decision to terminate her disability benefits under a group long-term disability policy and deny her claim for benefits under a group life insurance policy.   (Doc. 86).  The case proceeds before the court on LINA's Motion for Summary Judgment.   (Doc. 125).   The court will also consider Walker's request, in her brief, for the court to sua sponte enter summary judgment in her favor on her breach of contract claim.   (Doc. 128-1, at 15).

As discussed below, the court finds genuine disputes as to material facts prevent the entry of summary judgment in either party's favor on Walker's breach of contract claim.   However, the court will grant summary judgment in LINA's favor on the bad faith claim because Walker cannot prove that LINA's decisions to terminate and deny Walker's benefits lacked an arguable basis.

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. Rule 56(a).   The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact.   *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor.   *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).   The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion."   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).   In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   *Id.* at 1116-17; *see also Doe v Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"   *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the

jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted).   "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"   *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.   "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   *Id.* at 322-23.   In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense.   *Id.* at 323 (emphasis in original).

## EVIDENTIARY OBJECTIONS

Both parties raise objections to portions of their opponent's evidence.   The court overrules Walker's objections to evidence originating after LINA initially decided to terminate and/or deny her benefits, and her objections to LINA's expert reports.

The court will not resolve LINA's objections to Walker's expert witness testimony because that testimony does not materially affect the outcome of LINA's motion for summary judgment.

## I. The Court Can Consider Evidence Originating After LINA's Initial Denial Decision Because It Relates to LINA's Decision to Deny Walker's Appeals

At summary judgment, the court bears responsibility for determining whether disputes exist as to "material" facts.   Fed. R. Civ. P. 56(a).   "A fact is *material* if it is relevant or necessary to the outcome of the suit." *Gomez v. Harbor Freight Tools USA, Inc.*, 383 F. Supp. 3d 1376, 1378 (M.D. Ga. 2019) (emphasis in original) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   Evidence satisfies the relevance requirement if:   "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."   Fed. R. Evid. 401.

Walker raises a relevance objection to any evidence originating after LINA initially decided to terminate and/or deny her benefits under the two policies at issue,[2]

---

[2] Specifically, Walker objects to the following evidence because it originates after LINA's June 11, 2014, decision to terminate her long-term disability benefits:   (1) Mark Matzek's September 12, 2014, Functional Capacity Evaluation (FCE) (Doc. 125-25); (2) Randy Norris's November 6, 2014, Transferable Skills Analysis (TSA) (Doc. 125-26); (3) Dr. David Knapp's December 8, 2014, report (Doc. 125-24); and (4) LINA's January 26, 2015, appeal denial letter (Doc. 125-38).   She also objects

citing as justification the following provision: "[w]hether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision is made."   *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).   The court disagrees.   Walker's Second Amended Complaint challenges LINA's appeals denials as well as LINA's initial denial, and thus, documents originating after LINA's initial denial decision relate to the propriety of LINA's decisions to deny Walker's appeals.   (Doc. 86, ¶¶ 103-11).

## II.   Walker's Authentication and Hearsay Objections Do Not Warrant Exclusion of the Reports of Dr. Stephen G. Jacobson, Dr. Matthew Lundquist, Randy Norris, Colin Loris, Mark Matzek, and Dr. David Knapp

Walker objects that LINA failed to authenticate the following documents, and that those documents constitute inadmissible hearsay:   (1) Dr. Stephen G. Jacobson's February 12, 2014, report (Doc. 125-14); (2) Dr. Matthew Lundquist's May 28, 2014, report (Doc. 125-18); (3) Randy Norris's June 3, 2014, Transferable Skills Analysis

---

to the court considering any of the following evidence in connection with her Life Disability claim because it originates after LINA's August 29, 2013, decision to deny her Life Disability benefits:   (1) Dr. Stephen G. Jacobson's February 12, 2014, report (Doc. 125-14); (2) appeal denial letters dated February 25, 2014, May 7, 2014, and January 26, 2015 (Docs. 125-16, 125-17, 125-23); (3) Dr. Matthew Lundquist's May 28, 2014, report (Doc. 125-18); (4) Randy Norris's June 3, 2014, TSA (Doc. 125-20); (5) Colin Loris's June 5, 2014, TSA (Doc. 125-35); and (6) Randy Norris's November 6, 2014, TSA (Doc. 125-26).

(TSA) (Doc. 125-20); (4) Colin Loris's June 5, 2014, TSA (Doc. 125-35); (5) Mark Matzek's September 12, 2014, Functional Capacity Evaluation (FCE) (Doc. 125-25); (6) Randy Norris's November 6, 2014, TSA (Doc. 125-26); and (7) Dr. David Knapp's December 8, 2014, report (Doc. 125-24).

LINA does not purport to have properly authenticated any of the contested documents pursuant to Federal Rule of Evidence 901, but as of the 2010 amendments, Rule 56 does not require authentication at the summary judgment stage. *See Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125, 1133 (N.D. Ala. 2014) ("[A]uthentication is *not* required at the summary judgment stage.") (emphasis in original). Rather, Rule 56's 2010 amendment obligated Walker to object that the reports "*cannot* be authenticated," and thus, cannot be presented in a form that would be admissible at trial. *Abbott*, 44 F. Supp. 3d at 1135 (emphasis in original). Walker did not raise that objection, so her evidentiary entreaty on the authentication basis fails.

Moreover, the challenged reports do not constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). First, LINA does not offer the reports solely to disprove Walker's breach-of-insurance-contract claims by demonstrating she was no longer disabled. LINA also offers the reports to disprove

Walker's bad-faith claims by demonstrating the effect the reports had on the claims examiners' decisions finding her no longer disabled.   In that guise, the reports are non-hearsay because LINA offers them not for their truth vis-à-vis the bad-faith claim; they offer them for the effects upon the listeners, i.e., the claims examiners, regardless of the truth of the reports.  *See United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (party's "[o]ut-of-court declarations . . . offered only to show their effect on the listener" did not constitute hearsay); *Worsham v. Provident Companies, Inc.*, 249 F. Supp. 2d 1325, 1344 n.9 (N.D. Ga. 2002) (information in an insurer's claim file did not constitute inadmissible hearsay because the insurer offered it to explain the basis of its decision to terminate the plaintiff's benefits and to show a lack of bad faith, not to establish the plaintiff's non-disability status).

Furthermore, even if the challenged reports are offered for their truth, Rule 56 does not prohibit a court from considering such putative hearsay evidence at summary judgment.   As LINA concedes, Walker "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also Jones v. UPS Ground Freight,* 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999)) ("'[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced

to admissible form.'"").   However, LINA rebuts the objection by tendering it could

present any of the challenged reports at trial through the testimony of the individuals

who authored the reports.   *See Jones*, 683 F.3d at 1294 (citing *Pritchard v. S. Co. Servs.*, 92

F.3d 1130, 1135 (11th Cir. 1996)) ("The most obvious way that hearsay testimony can

be reduced to admissible form is to have the hearsay declarant testify directly to the

matter at trial."). [3]   Furthermore, the witnesses' reports reasonably fall within Federal

---

[3] Walker asserts LINA could not call Jacobson, Lundquist, Knapp, Norris, or Loris at trial because it never disclosed them as expert witnesses.   (Doc. 128-1, at 3).   However, Walker did not sufficiently develop its contention, and thus, the court declines to exclude the witnesses bereft of reasoned arguments from both parties.   Suffice to say at this juncture, Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert witnesses, yet it is not clear the afore-mentioned individuals constitute experts who must provide written reports, i.e., those who LINA "retained or specially employed to provide expert testimony in the case" or "whose duties as [LINA's] employee[s] regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).

To be sure, Rule 26(a)(2)(C), which governs expert witnesses who do not need to provide written reports, provides that such witnesses still need to be disclosed as to their subject matter and summary of their facts and opinions.   The penalty for non-disclosure results in the inability to use the expert's testimony at trial or for any other purpose, *unless* the failure to disclose "was substantially justified or is harmless."   Fed. R. Civ. P. 37(c)(1).

> In determining whether a failure to sufficiently disclose an expert witness is substantially justified or harmless, courts should consider (1) the importance of the testimony, (2) the reasons for the failure to disclose the witness earlier, and (3) the prejudice to the opposing party if the witness is allowed to testify.

*Shire Dev. LLC v. Watson Pharm., Inc.,* 932 F. Supp. 2d 1349, 1357 (S.D. Fla. 2013) (quoting *Cooley v. Great S. Wood Preserving,* 138 F. App'x 149, 161 (11th Cir. 2005) (in turn quoting *Bearint v. Dorell Juvenile Grp., Inc.,* 389 F.3d 1339, 1353 (11th Cir. 2004))).

Rule of Evidence 803(4)'s hearsay exception, which renders admissible any out-of-court statements "made for – and reasonably pertinent to – medical diagnosis," which appear to fit the bill here.   Thus, even if LINA were offering the challenged evidence exclusively to prove the truth of the matters asserted therein, the court could allow the evidence for purposes of deciding LINA's summary judgment motion.

---

The challenged testimony would prove crucial to LINA's defense to Walker's breach of contract claim, yet, because the parties have not developed these arguments, the court does not have the benefit of LINA's explanation for failing to disclose the witnesses as experts. However, demonstrating prejudice might prove difficult for Walker, because the course of discovery in this case may have readily occasioned the disclosure of such information, thus excusing any formal disclosure.   Indeed, Walker herself listed all of the afore-mentioned individuals as potential witnesses in her Initial Disclosures, and disclosed generally that each would testify as to facts regarding her medical conditions, restrictions, etc.   (Docs. 129-1, 129-2).   And as to a summary of the witnesses' facts and opinions, discovery actually occasioned the production of the witnesses' reports, not just mere summaries.   *See Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1412-13 (11th Cir. 2011) (stating that the purpose of the expert witness disclosure requirement is "so the opposing party can use the report to examine the expert at the deposition"); *In re Denture Cream Prod. Liab. Litig.*, No. 09-2051-MD, 2012 WL 5199597, at *6 (S.D. Fla. Oct. 22, 2012), *on reconsideration in part*, No. 09-2051-MD, 2012 WL 13008163 (S.D. Fla. Nov. 14, 2012) (noting "[c]ircumstances have already mitigated much of the possible prejudice resulting from expending resources to re-depose treating physicians").

To restate, Walker did not sufficiently develop any of the afore-mentioned issues, so there exists no need to elaborate upon them at this juncture.   The main thrust resulting from the cursory review here reveals arguable bases sanctioning the admissibility of LINA's expert witnesses based upon the information currently presented.

10

**III.    The Court Need Not Resolve LINA's Objections to the Expert Report of R. Bernard Harwood, Jr., Because Harwood's Proposed Testimony Does Not Materially Affect the Outcome of LINA's Summary Judgment Motion**

R. Bernard Harwood, Jr., submitted a Declaration dated January 6, 2020, and an expert report dated June 3, 2019.   (Doc. 128-2, at 6-48).   Walker retained Harwood to provide "expert opinions concerning whether [LINA]'s processing of her claims" constituted bad faith.   (Doc. 128-2, at 13).   Harwood opined:

> With respect to its processing and administration of each of Ms. Walker's disability claims, the evidence clearly establishes the existence of a jury question whether [LINA] in fact had a reasonable, arguable, or debatable reason to support its claims denials.   [LINA]'s testimony demonstrates its claim personnel were fully aware its claim processes generally, and its administration of Ms. Walker's claims specifically, were flawed and unreasonable.   [LINA]'s claims practices are systematically flawed thereby depriving its Alabama insureds, including Ms. Walker, of a full, fair, and accurate claim investigation and subsequent decision.   The evidence clearly presents a jury question of whether [LINA] knowingly, intentionally, and unreasonably:
>
> - Failed to obtain all relevant and necessary facts prior to denying each of Ms. Walker's disability claims.
>
> - Ignored and disregarded facts supporting each of Ms. Walker's disability claims.
>
> - Misrepresented Ms. Walker's rights and obligations under the Life Policy and the LTD Policy.
>
> - Violated its admitted duties as an Alabama insurer, as well as its own written policies and procedures.

11

The evidence clearly establishes the existence of a jury question whether [LINA] knowingly and intentionally acted with reckless disregard for Ms. Walker's rights as an Alabama insured.  Therefore, as further discussed herein, it is my professional expert opinion that a reasonable juror could conclude [LINA's] actions in the processing and administration of each of Ms. Walker's disability claims were (and continue to be) indicative of "bad faith."

(*Id.*).

LINA challenges Harwood's opinions and report pursuant to Federal Rule of Civil Procedure 56(c)(2) and Federal Rule of Evidence 702.   *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."). Specifically, LINA argues Harwood impermissibly offered expert testimony regarding legal conclusions, including the interpretation of contracts and insurance policies and the ultimate issue of whether LINA acted in bad faith.

12

The court need not decide whether Harwood's testimony satisfies the requirements of Rule 702. As discussed more fully infra, the adequacy of LINA's claims investigation procedures pertains only to the fifth element of a bad faith claim, which the court will not consider because Walker cannot satisfy the necessary third element of the claim. Therefore, Harwood's testimony does not materially affect the outcome of LINA's summary judgment motion.

## BACKGROUND

### I.    The Applicable Policy Provisions

### A.    The Group Long Term Disability Policy

LINA issued group long term disability policy number LK-963003 (the LTD Policy), effective October 1, 2011, to Health Care Authority of Athens Limestone Hospital. (Doc. 125-3, at 2). As a full-time employee of Athens-Limestone Hospital, Walker enjoyed eligibility for LTD benefits if she satisfied the Policy's definition of "Disability" or "Disabled." (*Id.* at 4, 10, 15).

Under the LTD Policy,

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

> 1.    unable to perform the material duties of his or her Regular Occupation; and

13

> 2.      unable to earn 80% or more of his or her Indexed Earnings
>         from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

> 1.      unable to perform the material duties of any occupation for
>         which he or she is, or may reasonably become, qualified
>         based on education, training or experience; and

> 2.      unable to earn 60% or more of his or her Indexed Earnings.

(*Id.* at 5).

The LTD Policy defines "Injury" as "[a]ny accidental loss or bodily harm which results directly and independently of all other causes from an Accident."   (*Id.* at 21). "Sickness" means "[a]ny physical or mental illness."   (*Id.* at 22).   "Regular Occupation" means:

> The occupation the Employee routinely performs at the time the
> Disability begins.   In evaluating the Disability, the Insurance Company
> will consider the duties of the occupation as it is normally performed in
> the general labor market in the national economy.   It is not work tasks
> that are performed for a specific employer or at a specific location.

(*Id.*).   "Indexed Earnings" means:

> For the first 12 months Monthly Benefits are Payable, Indexed
> Earnings will be equal to Covered Earnings.   After 12 Monthly Benefits
> are payable, Indexed Earnings will be an Employee's Covered Earnings

14

plus an increase applied on each anniversary of the date Monthly Benefits became payable.   The amount of each increase will be the lesser of:

    1.    10% of the Employee's Indexed Earnings during the preceding year of Disability; or

    2.    the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

(Doc. 125-3, at 21).   "Covered Earnings" means "an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins." (*Id.* at 5).   The LTD Policy adopted an elimination period of 90 days, thus necessitating an employee to suffer a disability for a continuous 90-day period before receiving benefits.   (*Id.* at 5, 10)

## B.    The Group Life Insurance Policy

LINA issued group life insurance policy FLX-964268 (the Life Policy), effective October 1, 2011.   Healthcare Authority of Athens Limestone Hospital subscribed to the Life Policy, and Walker enjoyed eligibility for Class 1 benefits under the Policy as a full-time employee at Athens-Limestone Hospital.   (Doc. 125-4, at 2; Doc. 125-5, at 2).

The Life Policy included a provision entitled "Extended Death Benefit with Waiver of Premium," which allowed a disabled employee's life insurance policy to continue for specified periods even if the employee did not remit premium payments.

(Doc. 125-4, at 14-15).   The "Extended Death Benefit with Waiver of Premium" provision encompassed two different subheadings:   "Extended Death Benefit" and "Waiver of Premium."

The Extended Death Benefit provision states:

If an Employee becomes Disabled and is less than age 60, the Life Insurance Benefits shown in the Schedule of Benefits will be extended without premium payment until the earlier of the following dates:

1.   The date the Employee is no longer Disabled.
2.   The date the Employee fails to qualify for Waiver of Premium or fails to provide proof of Disability as indicated under *Waiver of Premium.*

*Amount of Insurance*

If an Employee dies while he or she is Disabled and coverage is extended under this provision, the Insurance Company will pay a Death Benefit equal to the amount in effect on the date the Employee became Disabled.  . . .  The Insurance Company will pay benefits only if due proof of the Employee's continuous Disability is received within one year of the date of the loss.

"Disability"/"Disabled"   means because of Injury or Sickness the Employee is unable to perform all the material duties of his or her Regular Occupation; or is receiving disability benefits under the Employer's plan.

"Regular Occupation" means the occupation the Employee routinely performs at the time the Disability begins.  The Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.

16

(*Id.* at 14-15) (italics in original).

The Waiver of Premium provision states:

> If the Employee submits satisfactory proof that he or she has been continuously Disabled for the Waiver Waiting Period shown in the Schedule of Benefits, coverage will be extended up to the Maximum Benefit Period shown in the Schedule of Benefits.

> Such proof must be submitted to the Insurance Company no later than 3 months after the date the Waiver Waiting Period ends.   Premiums will be waived from the date the Insurance Company agrees in writing to waive premiums for that Employee.

> After premiums have been waived for 12 months, they will be waived for future periods of 12 months, if the Employee remains Disabled and submits satisfactory proof that Disability continues.   Satisfactory proof must be submitted to the Insurance Company 3 months before the end of the 12-month period.

*Amount of Insurance*

> If an Employee dies while he or she is Disabled and coverage is continued under this provision, the Insurance Company will pay a Death Benefit equal to the amount in effect on the date the Employee became Disabled.  . . .  The Insurance Company will pay benefits only if due proof of the Employee's continuous Disability is received within one year of the date of the loss.

*Termination of Waiver*

Insurance will end for any Employee whose premiums are waived on the earliest of the following dates.

1.     The date he or she is no longer Disabled.

2.     The date he or she refuses to submit to any physical examination required by the Insurance Company.

3.     The last day of the 12-month period of Disability during which he or she fails to submit satisfactory proof of continued Disability.

4.     The date following the end of the Maximum Benefit Period shown in the Schedule of Benefits.

"Disability"/ "Disabled" means because of Injury or Sickness an Employee is unable to perform all the material duties of any occupation which he or she may reasonably become qualified based on education, training or experience.

(*Id.* at 15).

The Life Policy defines "Sickness" as "[a]ny physical or mental illness," and it defines "Injury" as "[a]ny accidental loss or bodily harm which results directly and independently of all other causes from an Accident."  (*Id.* at 27).  Under Waiver of Premium coverage, the Maximum Benefit Period for a Class 1 Employee, like Walker, extends to age 65.  (*Id.* at 5).  The "Waiver Waiting Period" lasts "9 months from the date the Employee's Active Service ends."  (*Id.*).

18

## II.     Walker's Application for Benefits

Walker ceased working on October 13, 2012, due to chronic medical conditions, including fibromyalgia, arthritis, degenerative disc disease, adrenal insufficiency, hypertension, and hypothyroidism.  She has not worked since, and she applied for benefits under the LTD and Life policies sometime during October of 2012.  (Doc. 128-2, ¶¶ 3-6; Doc. 128-2, ¶ 5).

## III.    Walker's Social Security Disability Claim

Walker also applied for disability benefits from the Social Security Administration.  On April 8, 2014, an Administrative Law Judge (ALJ) found Walker disabled as of October 12, 2012, which denotes she could not "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  (Doc. 128-4, at 29).  Walker suffered from the severe impairments of osteoarthritis, adrenal medullary insufficiency, degenerative disc disease, hypertension, hypothyroidism, plantar fasciitis, gastroesophageal reflux disease, fibromyalgia, chronic pain, chronic fatigue, and obesity.  (*Id.* at 31).  Despite those impairments, Walker retained the residual functional capacity to perform

sedentary work as defined in 20 CFR 404.1567(a) except [she] can lift up to ten pounds occasionally.  She can occasionally use her hands for handling and fingering.  [She] can stand and walk for less than two hours and sit for less than two hours alternating positions every thirty minutes with normal breaks.  [She] can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds.  [She] can less than occasionally balance, stoop, kneel, crouch or crawl.  [She] can perform jobs that do not require concentrated exposure to extreme heat or cold, excessive vibration and pulmonary irritants.  [She] can perform jobs that did not [*sic*] require the operation of moving and hazardous machinery or work around to [sic] unprotected heights.

(*Id.* at 32).

Regarding the medical evidence underlying the finding, the ALJ considered treatment notes regularly documenting Walker's complaints of pain and fatigue, Walker's routine treatment for those conditions, her attendance at fibromyalgia group sessions to cope with her chronic pain, her extensive medication and injection regimen, and MRI results portraying arthritis in both shoulders and the right knee and degenerative spurring of the cervical spine.

The ALJ also afforded great weight to RFC ("residual functional capacity") Questionnaires Dr. Neighbors, Walker's primary care physician, completed on April 11, 2013, because they comported with the record.  In an Arthritis Residual Functional Capacity Questionnaire, Dr. Neighbors indicated Walker suffered from intractable pain at multiple sites, chronic fatigue, muscle spasms, and plantar fasciitis pain.  She

experienced adrenal fatigue and fibromyalgia pain one to three times a week, confining her to bed with a two- to three-day recovery time.   She also experienced reduced range of motion in her hips, shoulders, knee, and hands; joint warmth; impaired sleep; weight change; trigger points; redness; swelling; muscle spasm; joint deformity; abnormal posture; tenderness; abnormal gait; and positive straight leg raising test. (Doc. 128-2, at 67-71).

Walker did not malinger as to her symptoms, and emotional factors such as depression contributed to the severity of her symptoms and functional limitations. Walker's symptoms would constantly interfere with her attention and concentration, and she suffered marked limitation in her ability to cope with work stress.   Walker's medications caused side effects like dizziness, drowsiness, impaired coordination, and impaired cognition.   Her impairments, which would last at least twelve months, included:   walking only one city block without rest; sitting one hour at a time; standing 15 minutes at a time; sitting, standing, and walking for a total of less than two hours in an eight-hour work day; needing to walk around for at least three minutes out of every thirty minutes; using an assistive device in occasional standing and walking; occasionally lifting and carrying less than ten pounds; never lifting or carrying more than ten pounds; never using her hands, fingers, or arms; and never bending or twisting.   She likely would miss work more than three times a month, and medications likely would not help

her condition.   Dr. Neighbors opined Walker could not return to work.   (Doc. 128-2, at 67-71).

On a Fibromyalgia RFC Questionnaire, Dr. Neighbors stated Walker satisfied the American College of Rheumatology diagnostic criteria for fibromyalgia, and her impairments would persist for at least twelve months.   Walker experienced multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, temporomandibular joint dysfunction, numbness, tingling, depression, mitral valve prolapse, hypothyroidism, and chronic fatigue syndrome.   She did not malinger. (Doc. 128-2, at 72-75).

Changing weather, fatigue, movement, overuse, cold, stress, hormonal changes, and static positions increased her pain.   Her symptoms would frequently interfere with the level of attention and concentration she would need to perform even simple work tasks.   She could not perform even low stress jobs.   Her medications produced side effects including dizziness, drowsiness, decreased coordination, and agitation.   Dr. Neighbors assessed the same limitations on sitting, standing, walking, and using her hands as in the Arthritis RFC Questionnaire.   However, inconsistently with the Arthritis RFC Questionnaire, Dr. Neighbors indicated Walker could never lift any amount of weight.   She could rarely twist, stoop, and climb stairs, and she could never crouch, squat, or climb ladders.   She could occasionally turn her head to the right or

22

left and hold her head in a static position, but she could only rarely look down or up. (Doc. 128-2, at 72-75).

On a Multiple Impairment RFC Questionnaire, Dr. Neighbors stated Walker suffered from adrenal insufficiency, fibromyalgia, degenerative disc disease, chronic fatigue, hypertension, hypothyroidism, obstructive sleep apnea, insomnia, plantar fasciitis, gastro-esophageal reflux disease, gout, and irritable bowel syndrome. She experienced a moderate to severe progression of physical debilitation. Physical findings supporting Walker's diagnoses included fibromyalgia trigger points, reduced motion in spine and shoulders, difficulty arising from a sitting position, and difficulty bending and kneeling. MRI and blood test results also supported those diagnoses. (Doc. 128-2, at 76-81).

Walker's symptoms included extreme chronic fatigue, reduced range of motion, multiple trigger points, adjustment of daily activity levels, intractable pain, decreased tolerance for exercise, muscle spasms, and muscle pain following exercise. Walker experienced chronic pain and fatigue at a level eight out of ten severity, and medications did not completely relieve her pain. Walker could sit for one hour, and stand and walk for less than one hour, during an eight-hour day. She could occasionally lift and carry up to ten pounds, but she could never lift or carry more than ten pounds. She experienced marked limitations in grasping, turning, twisting, reaching, and using her

23

hands and fingers for fine manipulation.  Walker could not maintain her neck in a constant position, such as looking at a computer screen, and her symptoms likely would worsen if she worked in a competitive environment. (Doc. 128-2, at 76-81).

Walker's symptoms would constantly interfere with concentration and attention, but she did not malinger.  She could not tolerate even low stress environments, and her impairments would last more than twelve months.  Emotional factors would contribute to the severity of Walker's symptoms, and she would need to take unscheduled rest breaks at unpredictable intervals during an eight-hour work day.  She would miss work more than four days each month.  She displayed a high risk for infection, and she would need a job that permitted ready access to the restroom.  In addition, she would need to avoid wetness, fumes, humidity, gases, extreme temperatures, pushing, bending, pulling, stooping, kneeling, fine manipulation, and remaining in static positions for periods of time.  Walker reached the level of impairment Dr. Neighbors assessed in September of 2012.   (Doc. 128-2, at 76-81).

The ALJ afforded partial weight to an FCE ("functional capacity evaluation") Heidi Teague completed on January 7, 2013, because the record supported even greater limitations than Teague imposed.  Walker reported level three (of ten) pain at the commencement of the FCE and level five pain at the conclusion.  She could rarely (1 to 5% of the workday) lift 30 pounds to her waist, occasionally (6 to 33% of the

workday) lift 15 pounds, and frequently (34 to 66% of the workday) lift seven pounds. She could rarely carry 20 pounds with her bilateral upper extremities, occasionally carry ten pounds, and frequently carry five pounds.   She could rarely push with 78 pounds of force, occasionally push with 69 pounds of force, and frequently push with 39 pounds of force.   She could rarely pull with 101 pounds of force, occasionally pull with 75 pounds of force, and frequently pull with 50 pounds of force.   She could frequently walk and sit.   She demonstrated decreased squatting ability and antalgic gait.   She could climb 100 stairs, but she turned sideways to walk downstairs.   She demonstrated adequate hand grip strength and good balance.   She experienced decreased range of motion in the cervical spine, trunk, shoulder, hips, and knees.   She could work at the sedentary physical demand level.   (Doc. 125-11, at 2).

Patsy Bramlett, a certified rehabilitation counselor and licensed professional counselor, testified the Social Security Administration retained her in February 2014 to provide a professional opinion regarding Walker's vocational abilities.   The record in this case does not contain a copy of the documentation Bramlett submitted to the Social Security Administration, but Bramlett reiterated her opinions in the declaration she submitted to this court.   Bramlett considered Walker limited to occasionally lifting up to ten pounds, frequently lifting no weight, standing and walking for less than two hours in an eight-hour workday, sitting for less than two hours (in 30-minute intervals) in an

25

eight-hour workday, and occasionally handling and fingering.   Because of her limitations on lifting, walking, and standing, Bramlett opined Walker could not perform her past relevant work, and she did not possess any transferable skills that would allow her to work within her limitations, even at the sedentary level.   Walker could not perform any jobs existing in the competitive national economy.   (Doc. 128-2, ¶¶ 7-11).

Given Walker's residual functional capacity, the ALJ found she could not perform any past relevant work, and her acquired job skills did not transfer to other occupations.   (*Id.* at 33-34).   Therefore, the Social Security Administration found Walker disabled.   On April 14, 2014, it sent Walker a letter informing her she would receive an initial sum representing the benefits she should have received from April 2013 to March 2014.   She would begin receiving monthly payments in May 2014. (Doc. 125-33, at 2).

## IV.   LINA's Long-Term Disability Benefits Decision

On February 27, 2013, LINA awarded Walker disability benefits for a period of twenty-four (24) months, beginning in November of 2012, because it found her incapable of performing the material duties of her regular occupation, and of earning at least 80% of her regular earnings.   (Doc. 125-29, at 28-30; Doc. 125-3, at 2; Doc. 125-26, at 2-3).

On March 6, 2013, Tiffany Wilson, a LINA Group Claims Associate, sent an email to another LINA employee, asking, "Could you please do an addendum to NCM staffing dated 02/27/13 and address Ms. Cherri Walker's functionality from August 12, 2012 – October 12, 2012?  Ms. Walker's payroll records confirmed that she may be eligible for benefits during this time."  (Doc. 128-4, at 38).  LINA apparently did change Walker's date of disability to August 12, 2012,[4] even though Walker continued working through October 13, 2012.  (Doc. 128-22, at 45-53).  Deborah Bacak, LINA's long-term disability claims manager, testified LINA should not have chosen August 12, 2012, as Walker's disability date.  (Doc. 128-3, at 206, 299).  LINA never amended the date.

On June 9, 2014, LINA informed Walker it had overpaid on her LTD claim, "as a result of a retroactive Social Security Disability award."  (Doc. 128-4, at 76).  LINA requested a refund of the overpayment within 30 days.  (*Id.*).  LINA later reduced the

---

[4] If August 12, 2012, did constitute Walker's disability date, Walker would have begun receiving benefit payments on or about November 11, 2012, after the 90-day elimination period expired.  (Doc. 125-3, at 5, 10).  That payment commencement date comports with LINA's decision to terminate benefits as of November 11, 2014, two years later.  (*See* Doc. 125-34, at 3-4 (announcing the termination of benefits as of November 11, 2014); Doc. 125-3, at 5 (explaining that the definition of "Disability" changes after LINA has paid benefits for 24 months)).

overpayment amount. (Doc. 128-2, ¶ 10).   LINA deducted the overpayment amounts from Walker's LTD benefit payments.   (*Id.* ¶¶ 8, 10).[5]

On June 10, 2014, LINA informed Walker it had conducted a review of her file to determine her capability to perform the material duties of *any* occupation, and to earn at least 60% of her regular earnings, which represent considerations governing the extension of her eligibility for LTD benefits beyond the initial 24-month period.   As part of its review, LINA considered a Disability Questionnaire Walker completed on January 29, 2013,[6] and a report Dr. Matthew Lundquist completed on May 28, 2014. (Doc. 125-34, at 1).

Dr. Lundquist reviewed Walker's medical records from January 4, 2012, to April 14, 2014.   (Doc. 125-18, at 1-14).   He concluded Walker's medical conditions would limit her to occasional standing; walking; lifting, carrying, pushing, or pulling up to 20 pounds; climbing stairs; stooping; kneeling; crouching; crawling; reaching below the waist; reaching above chest level; fine manipulation; and simple and firm grasping.   Her

---

[5] The LTD Policy states:   "An Employee for whom Disability Benefits are payable under this policy may be eligible for benefits from Other Income Benefits.   If so, the Insurance Company may reduce the Disability Benefits by the amount of such Other Income Benefits."   (Doc. 125-3, at 11).   Other Income Benefits include "any Social Security disability . . . benefits the Employee . . . receives . . . ." (*Id.*).   The LTD Policy authorizes LINA to recover any overpayments by requesting a lump sum payment from the insured or reducing any benefits payable.   (*Id.* at 12).

[6] The court could not locate a copy of the January 29, 201, Disability Questionnaire in the record.

conditions would limit her to frequent[7] sitting; lifting, carrying, pushing, or pulling up to ten pounds; reaching at desk level; and use of her lower extremities for foot controls. Dr. Lundquist agreed with Teague's January 7, 2013, FCE that Walker could perform sedentary work because that finding adequately represented Walker's functionality as supported by medical records.   However, Dr. Lundquist disagreed with Dr. Neighbors' April 11, 2013, RFC findings that Walker could not sit more than one hour in an eight-hour day, occasionally lift more than ten pounds, or use her hands at all for any tasks, because those findings did not portray Walker's conditions "from an occupational medicine perspective." (*Id.* at 15-16).

LINA also referred Walker's claim to its Vocational Department for a TSA ("Transferrable Skills Analysis") by Rehabilitation Specialist Colin Loris.   Loris reviewed Walker's January 29, 2013, Disability Questionnaire and Dr. Lundquist's May 28, 2014, report.   He considered Walker's education, training, diagnoses, limitations, skills, abilities, and wage requirements, and he concluded Walker could perform occupations existing in her local labor market, including Office Manager and Health Care Facility Administrator.   (Doc. 125-35, at 2-3).

---

[7] Dr. Lundquist's report did not define the terms "occasional" or "frequent."

Based upon those assessments, LINA decided Walker no longer satisfied the definition of Disability under the LTD Policy as of November 11, 2014, and it informed her she would receive no further LTD payments after that date.   LINA considered Walker's award of Social Security Disability benefits, but it reached a different decision from the Social Security Administration because a different standard for evaluating disability applied.   (Doc. 125-34, at 3-4).

Walker appealed LINA's decision to terminate her LTD payments on a date the record does not specify.   On November 7, 2014, LINA sent Walker a letter informing her it would consider her complete file on appeal.   In addition, it had received additional records from Drs. Broome, Neighbors, and Chen, Walker's treating physicians, and physical therapist Mark Matzek's September 12, 2014, FCE.   (Doc. 125-37, at 2).

During the September 2, 2014, FCE, Walker reported level six (of ten) pain at the outset, and level eight pain upon completion of testing.   She could lift ten pounds from floor to waist, lift 25 pounds horizontally, carry 15 pounds with her bilateral upper extremities, push 50 pounds of force, and pull 55 pounds of force.   She displayed decreased tolerance for sitting, standing, and walking.   She displayed "good strength throughout but decreased muscular endurance and . . . limitations in joint mobility and

flexibility." Matzek opined claimant could perform work at the sedentary physical demand level. (Doc. 125-25, at 2).

LINA also engaged Dr. David Knapp, an independent Board Certified rheumatologist, who reviewed Walker's medical records from January 4, 2012, through October 7, 2014, and submitted a report on December 8, 2014. Dr. Knapp noted Walker's physicians had assessed her with chronic obstructive pulmonary disease, chronic pain syndrome, general osteoarthritis, multiple trigger point sites, gout, hyperglycemia, hyperlipidemia, hypertension, hypothyroidism, obesity, narcolepsy without cataplexy, rheumatoid arthritis, fibromyalgia, and adrenal medullary insufficiency. He also considered Walker's job duties as Director of Respiratory, Sleep, and Cardiovascular Therapy Services, including "responsibility in the proper performance of services rendered by departments under her direction, problem-solving, education, quality management, financial and purchasing functions, and staffing and operating efficiency." Those job duties required functions including "frequent walking, sitting, stooping, occasional standing, stretching, reaching, hand-finger dexterity, and lifting and carrying up to 40 pounds," as well as "constant hearing, seeing, and speaking." (Doc. 125-24, at 4-5).

Dr. Knapp conferred by telephone with Dr. Neighbors, Walker's primary care physician, and Dr. Kun Chen, Walker's rheumatologist. Dr. Neighbors declined to

31

address the extent of Walker's functional limitations, but she did comment that Walker

experienced chronic depression "with some degree of psychosomatic symptoms and

possible somatization," and she recommended a psychiatric evaluation.   Dr. Chen

stated Walker's "rheumatoid arthritis was under good control," and "her ongoing

complaints of chronic widespread pain and abdominal pain were related to

fibromyalgia."   While Dr. Chen did not think Walker

> had a rheumatologic impairment supporting restrictions, he felt that her
> multiple other medical problems and ongoing pain symptoms would limit
> her to a sedentary physical demand level occupation consistent with a desk
> job that required use of the hands and upper extremities and shoulders
> frequently with occasional walking, standing and push/pull/lift/carry
> activities up to a 20 lbs. weight limit.

(*Id.* at 24).

After reviewing Walker's medical records and considering his conversations with

Drs. Neighbors and Chen, Dr. Knapp declared:

> The records document a multitude of medical conditions, past,
> present, and recurring, that are adequately treated and not documented to
> be of a severity to require restrictions.   The majority of the claimant's
> multiple somatic complaints related to musculoskeletal pain and fatigue
> with activity intolerance and cognitive disturbances are in the setting of
> long-standing fibromyalgia and psychosocial stressors at home and at
> work.   Many of the complaints are attributed to relatively mild
> osteoarthritic findings in the joints and spine based on examination and
> diagnostic imaging.   Attempts to treat the claimant with an inflammatory
> or crystal induced arthritis are noted to be ineffective.   Orthopedic

32

evaluations and diagnostic studies have resulted in diagnoses of shoulder impingement syndrome and osteoarthritis of the knees based on examination findings and imaging studies.  The orthopedic examination findings of limitation of motion and pain on motion in large joints such as the shoulders and knees as well as the neck and back are also consistent with fear of movement characteristic of fibromyalgia and related chronic pain syndromes such as chronic low back pain.  Likewise, multiple imaging studies reveal mild or non-specific degenerative changes in the shoulders and knees.  Multiple diagnostic laboratory studies are noted to be negative, normal or non-diagnostic.

The functional capacity evaluations reflect ongoing subjective complaints of pain interfering with function with assignment of restrictions for a sedentary physical demand level occupation.  Ongoing multisystem somatic complaints of pain associated with fatigue and cognition are characteristic of fibromyalgia and appear to be the sources of the claimant's distress rather than the multiple conditions listed, which the complaints have been attributed to.

Based on the documentation reviewed, the claimant does not require any medically necessary work activity restrictions from 07/13/2012 and continuing in regards to multiple somatic complaints of chronic widespread pain and fatigue with associated cognitive difficulties that appear to be manifestations of fibromyalgia rather than clinically significant and measurable impairments associated with clinically significant swelling, deformity, weakness or limitation of motion related to structural changes rather than subjective complaints of pain.

(Doc. 125-24, at 22).

Dr. Knapp disagreed with Mark Matzek's September 12, 2014, FCE, insofar as Matzek attributed Walker's limitations to "clinically significant or active inflammatory

33

arthritis or non-specific degenerative arthritis."   According to Dr. Knapp, the medical record did not support a finding of clinically significant arthritis; rather, it reflected Walker's limitations resulted from fibromyalgia.   (*Id.* at 24).

After completing its appellate review, LINA upheld its decision to discontinue Walker's benefits beyond November 10, 2014, explaining:

> To clarify your functionality, we referred your file for an independent medical review by a physician board certified in Internal Medicine and Rheumatology.   The physician reviewed all of the medical documentation contained in your claim file.
>
> After review of the entirety of the medical documentation contained in the file, we have concluded your medical records do not provide documentation which indicates your medical conditions rise to a level of severity to preclude your performance of any occupation beyond November 10, 2014.
>
> The Medical Reviewer indicated your symptoms are related to fibromyalgia rather than clinically significant or active inflammatory arthritis, or non-specific degenerative arthritis.   There are no severe findings documented on imaging studies or examination.
>
> Your medical record reflects you have complains [*sic*] of pain and/or fatigue that are out of proportion to the measurable medical, rheumatologic, neurologic or orthopedic pathology documented.
>
> Your physicians do indicate multiple somatic complaints and diagnostic labels.   However, the records do not document measurable pathology as determined by diagnostic testing of a severity to account for the aforementioned diagnostic labels.

34

The Medical Reviewer further indicated Fibromyalgia is not a condition that requires work related restrictions in the absence of clinically significant physical or cognitive limitations as determined by physical examination, mental status examination, functional assessments, imaging and/or laboratory testing.

Our review further noted the medical records in your claim do not contain medical evidence which demonstrates anatomical or physiological abnormalities manifested by signs or laboratory findings of overt physical impairments.

We noted you attended a Functional Capacity Evaluation on September 12, 2014.   At this evaluation you demonstrated the functional ability to work within a Sedentary physical demand activity level as defined by the U.S. Department of Labor.

Sedentary – Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body.   Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.   Jobs are Sedentary if walking and standing are required only occasionally and all other Sedentary criteria are met.

Based on the above information, the occupations identified in the Transferable Skills Analysis performed on November 6, 2014, are appropriate based on our review of your medical records, vocational history as well as the requirements under the policy.

Therefore, you have retained function which allows for work capacity[,] and appropriate occupations were identified based on the policy requirement as well as your prior wages.   As such, you do not meet the definition [of] Disability after July 30, 2014.

(Doc. 125-38, at 3-4).    LINA considered Walker's receipt of Social Security Disability benefits, but it reached a different decision than the Social Security Administration because different criteria governed Walker's claims for disability benefits under the LTD Policy.    (*Id.* at 4).

LINA's appeal denial letter referred to Rehabilitation Specialist Randy Norris's November 6, 2014, TSA.   Norris considered Walker's work experience, education, training, medical diagnoses, wage requirements, skills, and abilities.   He also relied upon the limitations Mark Matzek imposed in his September 12, 2014, FCE, and he concluded Walker could perform occupations in her local labor market, including Skill-Training Program Coordinator and Department Manager.   (Doc. 125-26).

## V.    LINA's Waiver of Premium Benefits Decision

On March 4, 2013, after LINA had initially approved Walker's LTD benefits claim on February 27, 2013, it also provisionally approved her for Extended Death Benefits (EDB), with a disability commencement date of October 13, 2012, which approximately corresponded to the date on which Dr. Neighbors recommended Walker cease work.   (Doc. 125-6, at 2).   Pursuant to the EDB provision of the Life Policy, that approval entitled Walker, who was less than 60 years old, to an extension of her life insurance benefits "without premium payment" until she either ceased suffering a

disability, or she failed "to qualify for Waiver of Premium or fail[ed] to provide proof of Disability as indicated under Waiver of Premium." (Doc. 125-4, at 14).   Melissa Smith, LINA's Claims Manager, testified that LINA automatically approved applicants for EDB benefits after approving them for the initial, 24-month period of LTD benefits, because those two types of benefits both required the claimant to demonstrate inability to perform the material duties of her regular occupation. (Doc. 125-7, at 33-34, 36).

On July 9, 2013, LINA informed Walker it was reviewing her Waiver of Premium (WOP) claim. (Doc. 125-8, at 2). That date approximately corresponded to the end of the nine-month Waiver Waiting Period that commenced when Walker ceased working on October 12, 2012. (*See* Doc. 125-4, at 5 (stating that the Waiver Waiting Period for WOP Benefits extends "9 months from the date the Employee's Active Service ends")). Pursuant to the WOP provision of the Life Policy, if Walker presented "satisfactory proof that . . . she has been continuously Disabled for the Waiver Waiting Period," the waiver of life insurance premiums she had been automatically receiving as EDB would extend "up to the maximum Benefit Period," or, for Walker, up to age 65. (Doc. 125-4, at 5, 15). To extend her eligibility for life insurance without premium payments beyond the nine-month Waiver Waiting Period, Walker would need to satisfy the WOP's stricter definition of disability by proving she could not perform the material

duties of any occupation for which she might reasonably become qualified based on education, training, or experience.   (*Id.* at 15).

To determine whether Walker satisfied the "any occupation" definition of disability, LINA requested additional medical information from Drs. Chen, Wood, Noel, and Boyett, her treating physicians.   LINA reminded Walker she bore ultimate responsibility for ensuring LINA received the requested information within 45 days, and it cautioned Walker that if it did not receive the information by August 22, 2013, it may either make a decision based upon the information it did have available, or it may delay its claims decision until it received additional information.   (Doc. 125-8, at 2).

On July 24, 2013, LINA sent Walker another letter, informing her it could not make a determination based upon the available information, and reminding her it needed additional information from Drs. Chen, Byrum, Noel, and Wood.   LINA cautioned Walker that if it did not receive the requested information by August 22, 2013, it would make a determination based upon the information currently in the file. (Doc. 125-9, at 2).

On July 3, 2013, LINA referred Walker's January 7, 2013, FCE results to Larry Featherston, Ph.D., a Rehabilitation Specialist, for a TSA.   Featherston considered Walker's work experience, education, training, diagnoses, functional limitations, wage requirement, skills, and abilities.   He concluded Walker could perform occupations in

her local labor market, including Outpatient Services Director and Office Manager. (Doc. 125-12, at 2-4).   Based on the results of the TSA, LINA determined Walker could not establish her inability to perform the material duties of any occupation, as WOP coverage required.   Therefore, LINA sent Walker a letter on August 29, 2013, denying her WOP claim.   (Doc. 125-10, at 3-4).

Walker appealed the denial decision on some date before September 6, 2013.[8] LINA engaged Dr. Stephen G. Jacobson, a board-certified physician in Occupational and Internal Medicine, to review the file on appeal.   Dr. Jacobson filed a report on February 12, 2014, after reviewing Walker's medical records from January 29, 2013, to September 25, 2013.   (Doc. 125-14, at 2-6).   He opined, within a reasonable degree of medical certainty, that "the medical records reviewed do not provide documentation of significant clinical findings of deficits to support continuous limitations to preclude [Walker] from performing" at the sedentary exertional level Teague assessed in the January 7, 2013, FCE.   (*Id.* at 4).

On February 25, 2014, LINA denied Walker's appeal and upheld its prior decision to deny Walker's WOP claim.   An Appeals Specialist, Medical Director, and

---

[8] The record does not specify the date of Walker's appeal, but LINA sent Walker a letter on September 6, 2013, acknowledging the appeal.   (Doc. 125-13).

Senior Appeals Specialist reviewed Walker's appeal.   They relied upon Dr. Jacobson's decision that Walker could perform at the sedentary level Teague assessed in the January 7, 2013, FCE.   They also relied upon the results of Featherston's July 3, 2013, TSA. Because Walker could perform sedentary work, she did not meet the applicable definition of Disability, which required proof that she could not perform the material duties of any occupation for which she may reasonably become qualified based on education, training, or experience.   (Doc. 125-16, at 2-3).

Walker filed a second appeal on some date before May 7, 2014,[9] and LINA sent Walker's file for an independent peer review by Dr. Lundquist.   (Doc. 125-17, at 2; Doc. 128-18).   The court discussed Dr. Lundquist's May 28, 2014, report on page 28-29, *supra*.

On June 3, 2014, LINA Rehabilitation Specialist Randy Norris conducted a TSA. He considered Walker's work experience, education, training, diagnoses, wage requirements, skills, and abilities, as well as the limitations Dr. Lundquist assessed. Norris concluded Walker could perform occupations in her local labor market,

---

[9] The record does not specify the date of Walker's second appeal, but LINA sent Walker a letter on May 7, 2014, acknowledging the appeal.   (Doc. 125-17).

including Information Clerk, Department Manager, Animal Hospital Office Supervisor, and Health Care Facility Administrator.   (Doc. 125-20, at 2-3).

On June 4, 2014, a LINA Appeals Specialist denied Walker's second appeal and upheld LINA's prior decision to deny Walker's WOP claim.   LINA relied upon Teague's January 7, 2013, FCE, Dr. Lundquist's May 28, 2014, report, and Norris's June 3, 2014, TSA.   None of that evidence provided a basis for altering LINA's previous decision to deny Walker's claim because the evidence did not demonstrate Walker lacked the ability to perform the material duties of any occupation for which she might become qualified by education, training, or experience.   LINA considered Walker's award of Social Security Disability benefits, but it reached a different decision from the Social Security Administration because a different standard for evaluating disability applied.   (Doc. 125-19, at 2-4).

Walker filed a third appeal on some date before November 19, 2014.[10]   An Appeal Specialist and Senior Appeal Specialist evaluated that appeal.   (Doc. 125-23, at 2-3).   LINA also referred the file for a peer review by Dr. David Knapp on December

---

[10] The record does not specify the date of Walker's third appeal, but LINA sent Walker a letter on November 19, 2014, acknowledging the appeal.   (Doc. 125-22).

8, 2014.   (Doc. 125-25).    The court discussed Dr. Knapp's findings at pages 30-33,

*supra*. (*See* Doc. 125-24).

On January 26, 2015, after completing its review, LINA denied Walker's third

appeal, stating:

> After review of the entirety of the medical documentation contained in the file, we have concluded your medical records do not provide documentation which indicates your medical conditions rise to a level of severity to preclude your performance of any occupation as provided in the Life Insurance Policy.

> The Medical Reviewer indicated your symptoms are related to fibromyalgia rather than clinically significant or active inflammatory arthritis, or non-specific degenerative arthritis.   There are no severe findings documented on imaging studies or examination.

> Your medical record reflects you have complaints of pain and/or fatigue that are out of proportion to the measurable medical, rheumatologic, neurologic or orthopedic pathology documented.

> Your physicians do indicate multiple somatic complaints and diagnostic labels.   However, the records do not document measurable pathology as determined by diagnostic testing of a severity to account for the aforementioned diagnostic labels.

> The Medical Reviewer further indicated Fibromyalgia is not a condition that requires work related restrictions in the absence of clinically significant physical or cognitive limitations as determined by physical examination, mental status examination, functional assessments, imaging and/or laboratory testing.

Our review further noted the medical records in your claim file do not contain medical evidence which demonstrates anatomical or physiological abnormalities manifested by signs or laboratory findings of overt physical impairments.

We noted you attended a Functional Capacity Evaluation on September 12, 2014.  At this evaluation you demonstrated the functional ability to work within a Sedentary physical demand level as defined by the U.S. Department of Labor.

*Sedentary – Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are Sedentary if walking and standing are required only occasionally and all other Sedentary criteria are met.*

Based on the above information, the occupations identified in the Transferable Skills Analysis performed on November 6, 2014, are appropriate based on our review of your medical records, vocational history as well as the requirements under the policy.

Therefore, you have retained function which allows for work capacity[,] and appropriate occupations were identified based on the policy requirement.  As such, you do not meet the definition [of] Disability under the Life Insurance Policy.

(Doc. 125-23, at 2-3) (italics in original).    LINA considered Walker's award of Social

Security Disability benefits, but it reached a different decision from the Social Security

Administration because a different standard for evaluating disability applied.  (*Id.* at 3-

4).

43

## VI.    Walker's Vocational Expert Opinion

Walker engaged John W. McKinney, III, a Certified Rehabilitation Counselor, Certified Vocational Evaluator, and Licensed Professional Counselor, to conduct "a vocational evaluation of her employability and wage-earning potential in the local competitive labor market given her cumulative severe medical impairments and subsequent denial/cessation of her long-term disability (LTD) insurance benefits provided through [LINA] in November, 2014."   (Doc. 128-2, at 51).   In addition to depositions and excerpts from Walker's LINA claim file, McKinney considered documents related to Walker's Social Security claim; the January 7, 2013, FCE; the January 29, 2013, Disability Questionnaire; Dr. Neighbors' April 11, 2013 RFC Questionnaires; Featherston's July 3, 2013, TSA; Dr. Lundquist's June 28, 2014, report; Norris's June 3, 2014, and November 6, 2014, TSA's; Loris's June 5, 2014, TSA; and Matzek's September 12, 2014, FCE.   He questioned Walker regarding her education, training, and employment history.   (*Id.* at 52-53).

McKinney questioned the results of Featherston's July 3, 2013, TSA, because LINA had provided Featherston only "the most-favorable factors interpreted from the FCE conducted in January, 2013." (*Id.* at 55).   He also opined that "Walker does not possess direct and readily transferable job skills to such occupations" because the available occupations Featherston identified did not fall "in the same occupational

44

grouping as any work activities previously performed by Ms. Walker or immediately associated with job skills attained by her. . . ."  (*Id.*).

McKinney discounted Dr. Lundquist's May 28, 2014, assessment because "Dr. Lundquist was never actually acquainted with or had access to interview, examine or evaluate Ms. Walker, [yet still Lundquist] categorically disregarded the opinions proffered by her treating physician, Dr. Neighbors, as they were 'not from an occupational medicine perspective.'"  (*Id.* at 56).

McKinney criticized Norris's June 3, 2014, TSA, because Norris "did not investigate the income requirements or demand wages" for the occupations he identified.  (*Id.*).  McKinney also disagreed with Loris's June 5, 2014, conclusion that Walker could transfer to available jobs including Office Manager and Health Care Facility Administrator.  According to McKinney, the Health Care Facility Administrator position fell within the light, not sedentary, exertional category because it required standing and walking more than one-third of a workday.  Those exertional requirements exceeded the restrictions Dr. Lundquist imposed.  The Office Manager position did not "include any association with occupations previously performed by Ms. Walker," and it required frequent reaching, handling, and fingering, while Dr. Lundquist limited Walker to only occasional fine manipulation, grasping, and reaching above chest level.   (Doc. 128-2, at 57; *see also* Doc. 125-18, at 16).

45

McKinney disagreed with Norris's November 6, 2014, conclusion that Walker could transfer to available occupations including Department Manager and Skill Training Program Coordinator.   The Skill Training Program Coordinator position would require a master's level degree in rehabilitation counseling or a related field, and Walker did not possess such a degree.   The Department Manager position would require at least a bachelor's degree and work experience supervising individuals in Walker's former position.   (Doc. 128-2, at 58).

McKinney opined that the work restrictions Dr. Neighbors imposed in April of 2013

> would prevent an individual from resuming any type of competitive employment (based on the inability to attend work consistently/excessive absenteeism, diminished maintenance of attention/concentration, sit/stand/walk in combination for an 8-hour workday, etc.).   Based on the 2013 opinions of Dr. Neighbors, Ms. Walker would be unable to resume her prior employment, possesses no transferable job skills to other accommodating occupations, and is incapable of performing even Sedentary-Entry Level/Unskilled employment, much less occupations paying in excess of wage requirements per the [LINA] LTD policy.

(*Id.* at 59-60).

McKinney summarized the January 7, 2013, and September 12, 2014, FCE's as limiting Walker to sedentary level work with restricted sitting, standing, walking, work postures, and use of upper extremities.   According to McKinney,

46

> at all skill levels only 11% of the entirety of jobs in the labor market per
> the Dictionary of Occupational Titles receive a Sedentary classification
> and more than 90% of all occupations would be eliminated from the labor
> force if reaching and/or handling are precluded on more than an
> Occasional basis.

(*Id.* at 60).   The limitations imposed would prevent not only Walker's prior work, but also any occupations in the local labor market for which she would possess transferable job skills and receive adequate compensation.   McKinney viewed Walker's lack of a graduate level degree as a significant limitation to her ability to work in the Medical and Health Services Managers industry.   (*Id.*).

McKinney characterized Dr. Lundquist's assessment as imposing "a very restricted range of Light occupations with postural limitations and manipulative limitations . . ., but with limited standing/walking, use of the upper extremities, and maintenance of other work postures."   (*Id.*).   Those limitations would preclude not only Walker's past work, but also all other identifiable jobs to which she could transfer and maintain her wage requirements.   (*Id.*).

In conclusion, McKinney opined that Walker "met the requirement of 'Disability' at all times since October 2012."   (Doc. 128-2, at 61).   He criticized LINA's TSA's because

> no attempt was made to personally contact her and acquire or substantiate
> information regarding factors comprising the individual's vocational

profile, no record review was conducted (other than the cherry-picked minimalistic details from [LINA] referral sources) despite their employer readily possessing such information, and overall a true lack of "reasonable efforts" to provide "appropriate services" that would allow the possibility of a credible, valid, unbiased, and objective outcome.

(*Id.*).

## DISCUSSION

Walker's Second Amended Complaint asserts claims against LINA for breach of contract and bad faith.   (Doc. 86).[11]   The court finds genuine disputes of material facts prevent the entry of summary judgment in either party's favor on Walker's breach of contract claim.   However, the court will grant summary judgment in LINA's favor on the bad faith claim because Walker cannot establish LINA's decisions to terminate and/or deny Walker's benefits lacked an arguable basis.

---

[11] Walker originally filed this case under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.   (Doc. 1).   After discerning her former employer, the Health Care Authority of Athens and Limestone County, constituted a governmental entity for purposes of the ERISA statute, Walker amended her Complaint to assert state law claims for breach of contract and bad faith.   (Doc. 21).   *See* 29 U.S.C. § 1003(b)(1) (ERISA does not apply to a "governmental plan"); *Id.,* § 1002(32) ("The term "governmental plan" means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.").   Walker's Second Amended Complaint asserts the same claims.   (Doc. 86).

## I.   Genuine Disputes of Material Facts Prevent the Entry of Summary Judgment in Favor of Either Party on Walker's Breach of Contract Claim

Pursuant to Alabama statute, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application which is a part of the policy."   Ala. Code § 27-14-17(a).   "Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996) (citation omitted).   When its intention is clear and unambiguous, the court shall enforce an insurance policy as written. *Sentinel Ins. Co. v. Alabama Mun. Ins. Corp.*, 188 So. 3d 640, 644 (Ala. 2015) (citation omitted).   Furthermore, "[i]f the terms of an insurance policy are plain and unambiguous, the interpretation of the contract and its legal effect are questions of law."   *Id.* (citing *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 697 (Ala. 2003)).

To recover on a breach-of-contract claim, "a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v.*

*RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011) (citation omitted).  LINA does not dispute the first, second, and fourth elements.  It also does not dispute that it terminated Walker's coverage under the LTD Policy and denied her WOP benefits under the Life Policy.  However, LINA argues its non-payment of benefits did not constitute a breach because Walker did not satisfy the definition of disability under either policy.

In Alabama, "the insured bears the initial burden of establishing insurance coverage by demonstrating that a claim falls within the insurance policy."  *Pyun v. Paul Revere Life Ins. Co.*, 768 F. Supp. 2d 1157, 1169 (N.D. Ala. 2011) (citing *Shalimar Contractors, Inc. v. American States Ins. Co.,* 975 F. Supp. 1450, 1454 (S.D. Ala. 1997) (in turn citing *Colonial Life & Accident Ins. Co. v. Collins,* 280 Ala. 373, 194 So. 2d 532, 535 (1967))).  Thus, to succeed on her breach of contract claim under either policy, Walker must demonstrate she cannot perform the material duties of any occupation for which she is or may reasonably become qualified.[12]  (Doc. 125-3, at 2;

_____

[12] Walker raises questions regarding which definition of disability should apply under the Life Policy, but there exists no reasonable dispute.  To qualify for EDB under the Life Policy, Walker had to prove she could not perform the material duties of her own occupation.  She satisfied that definition, and she received life insurance benefits without paying premiums during the nine-month Waiver Waiting Period after she ceased working in October 2012.  Walker does not assert a claim for denial of EDB benefits, because LINA never denied those benefits.  After the nine-month Waiver Waiting Period expired, Walker bore the heavier burden of proving she could not perform the material duties of *any* occupation to continue receiving life insurance benefits without paying premiums under the

Doc. 125-4, at 15); s*ee Pyun*, 768 F. Supp. 2d at 1169 ("In other words, in order for there to be a breach of the insurance contracts here, Plaintiff must show that his medical condition prevented him from working full time and thus caused a reduction in his income.").

Genuine disputes of material facts regarding Walker's impairments pursuant to the disability definition preclude the entry of summary judgment in either party's favor on the breach of contract claim.   Dr. Neighbors, Walker's primary care physician, described impairments in her April 11, 2013, RFC Questionnaires that would preclude Walker from working in any capacity.   For example, Walker could sit, stand, and walk for a total of less than two hours in an eight-hour workday; she could never use her hands at work; and she would miss work more than three to four days a month.   From a vocational perspective, McKinney rejected the opinions LINA's employees offered in their TSA reports, and he concluded a person with the work restrictions Dr. Neighbors imposed could not perform any job for which Walker would possess transferable job skills and receive adequate compensation.   The Social Security Administration found Walker could not "engage in any substantial gainful activity," and it granted her

---

WOP provision.   LINA denied Walker's benefits under the "any occupation" definition of the WOP provision, not the "own occupation" definition of the EDB provision.

51

disability benefits.   Bramlett testified, from a vocational perspective, that Walker could not perform any jobs existing in the competitive national economy.

That evidence supports the conclusion that Walker cannot perform the material duties of any occupation for which she is or may become qualified.   Thus, a reasonable juror could credit that evidence and conclude Walker satisfied the definition of disability under the LTD and Life policies.

However, LINA presented contrary evidence.   Teague stated in her January 7, 2013, FCE, that Walker could perform sedentary work, and Featherston's TSA opined that a person with the limitations Teague assessed could perform occupations in the local labor market.   Drs. Lundquist and Jacobson both agreed with Teague's assessment.   Norris's June 3, 2014, TSA and Loris's June 5, 2014, TSA opined that a person with the limitations Dr. Lundquist assessed could perform occupations existing in the local labor market.   Matzek also opined, after conducting the September 12, 2014, FCE, that Walker could perform sedentary work.   Norris's November 6, 2014, TSA opined that a person with the limitations Matzek assessed could perform occupations existing in the local labor market.   On December 8, 2014, after conferring

with Drs. Neighbors and Chen, Walker's rheumatologist, Dr. Knapp opined that Walker did not require any work activity restrictions.[13]

Thus, the testimony of LINA's medical and vocational experts supports the conclusion that Walker can perform sedentary work. A reasonable juror could credit the testimony of LINA's witnesses and conclude Walker did not suffer a disability, as defined in the LTD and Life Policies.

Walker asserts that LINA's FCEs and medical reports actually support her disability claim, not LINA's denial decision, because they "confirm[] Ms. Walker is incapable of sitting the majority (six hours or more) of the workday, and her reaching, handling, and fingering abilities are impaired." (Doc. 128-1, at 20). First, with regard to the hand impairments, none of LINA's medical or vocational experts opined those impairments manifested so severely as to prevent all work.

As for the sitting evaluations, Walker's characterization of the FCEs and medical reports is factually accurate because the reports state that Walker can sit for up to 66% of the workday, or up to 5.28 hours. However, whether Walker can sit for six hours or 5.28 hours does not bear dispositive legal significance. The Department of Labor's

---

[13] Dr. Knapp disagreed with Matzek's FCE, but only insofar as Matzek attributed Walker's impairments to arthritis instead of fibromyalgia.

(DOL's) guidelines, which LINA employed, classify sedentary work as involving the function of sitting "most of the time," not for six hours.   (*See* Doc. 125-23, at 2-3; Doc. 125-38, at 3-4; *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. 2008) ("Under the Federal Department of Labor's definitions of types of work, . . . 'sedentary work' . . .  involves 'sitting most of the time, but may involve walking or standing for brief periods of time.   Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.'")).   The assessments upon which LINA relied support Walker's ability to sit "most" of an eight-hour work day.

Moreover, Walker relied upon a single footnote from an unpublished district court decision to support her argument.   In *Disanto v. Wells Fargo & Co.*, No. 8:05CV1031 T27MSS, 2007 WL 2460732 (M.D. Fla. Aug. 24, 2007), the district court declared that "[s]edentary work generally requires *six* hours of sitting in an eight hour work day."   *Id.* at *5 n.7 (emphasis in original).   That statement requires a closer examination, though.   The court cited Social Security Rule 83-10, which states, in describing sedentary work, that "sitting should generally total *approximately* 6 hours of an 8-hour workday."   *Disanto,* 2007 WL 2460732, at *5 n.7 (emphasis supplied); *see also* SSR 83-10, 1983 WL 31251, at *5.   Thus, SSR 83-10 explains the *Disanto* decision's equivocation as to the sitting requirements of sedentary work.   Such work does not

54

require a *minimum* of six hours sitting; it requires *approximately* six hours of sitting, which comports with the findings in this case that sedentary work encompassed sitting up to 66% of a work day, or 5.28 hours.

And in any event, the definition of sedentary work in an administrative filing by the Social Security Administration does not control the definition under the insurance policies at issue in this case.   Therefore, Walker's arguments do not persuade the court, which finds that a reasonable juror could conclude the FCE's and medical reports support LINA's decision to terminate and/or deny Walker's benefits.

Because reasonable jurors could reach opposite conclusions regarding Walker's disability status after evaluating the evidence presented, the court cannot grant summary judgment in favor of either party on Walker's breach of contract claim.   *See Greenberg*, 498 F.3d at 1263.[14]   That claim will proceed to trial.[15]

---

[14] Walker did not move for summary judgment, but in her response to LINA's motion, she asks the court to sua sponte grant summary judgment in her favor on the breach of contract claims.   (Doc. 128-1, at 18) ("Alternatively, this Court should sua sponte grant summary judgment to Ms. Walker on these claims."). A "district court's power to render summary judgment sua sponte stems from the court's interest in judicial economy." *Fils v. City of Aventura*, 647 F.3d 1272, 1286 (11th Cir. 2011).   The court cannot grant Walker's request because the same genuine disputes of material facts that preclude the entry of summary judgment in LINA's favor also preclude the entry of summary judgment in Walker's favor.

[15] The court rejects Walker's categorical assertion that "whether an individual meets a definition of disability is a question of fact for a jury to decide."   (Doc. 128-1, at 18).   First, Walker cites only a district court case addressing the definition of disability under the Americans With Disabilities Act

## II.   Walker's Bad Faith Claim Fails Because She Cannot Prove LINA Lacked a Legitimate, Arguable, or Debatable Reason for Terminating Her Disability Benefits

The Alabama Supreme Court recognizes the tort of bad faith failure to pay an insurance claim "where there is either '(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *Chavers v. National Sec. Fire & Cas. Co.,* 405 So. 2d 1, 7 (Ala.1981)).   Those two scenarios comprise a single tort with two slightly different methods of proof.   *Brechbill,* 144 So. 3d at 257-58 ("[T]here is only *one* tort of bad-faith refusal to pay a claim, not two 'types' of bad faith or two separate torts.") (emphasis in original); *see also Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018) ("Under Alabama law, bad faith is a 'singular' tort with two different methods of proof

---

(ADA), and a 1980 case from the Alabama Court of Civil Appeals, to support her argument.   *See Lawson v. Plantation Gen. Hosp., L.P.,* 704 F. Supp. 2d 1254, 1279 (S.D. Fla. 2010); *Key Life Ins. Co. of S.C. v. Burns*, 390 So. 2d 1064, 1067 (Ala. Civ. App. 1980).   However, even if Walker had cited more applicable and persuasive authority, the court rejects the categorical pronouncement that it can never decide at summary judgment whether an employee satisfies the definition of disability under an employer-provided insurance policy.   The determination must persist on a case-by-case basis, and the employee retains her burden of providing evidence that she meets the definition in each case.   If she does so, or if the applicable evidence conflicts, as it does in the present case, the court should deny summary judgment and proceed to trial.   If the employee fails to satisfy her burden, the court can grant summary judgment in favor of the insurer.

— 'normal' bad faith, also known as bad faith refusal to pay, and 'abnormal' bad faith, also known as bad faith failure to investigate.").

> This tort has four elements plus a conditional fifth element, as follows:
>
> "(a) an insurance contract between the parties and a breach thereof by the defendant;
>
> "(b) an intentional refusal to pay the insured's claim;
>
> "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
>
> "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
>
> "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

*Brechbill*, 144 So. 3d at 257 (quoting *National Sec. Fire & Cas. Co. v. Bowen,* 417 So. 2d 179, 183 (Ala. 1982)).

Courts refer to the first method of proof as "bad faith refusal to pay," "normal" bad faith, or "ordinary" bad faith.  To succeed on a "normal" bad faith theory, a plaintiff must prove the first four elements the Alabama Supreme Court set forth in *Brechbill*.  Courts refer to the second method of proof as "bad faith refusal to

investigate," "abnormal" bad faith, or "extraordinary" bad faith.   To succeed on that theory, a plaintiff must prove all five elements.  *Brechbill,* 144 So. 3d at 258 (quoting *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968, 976 (1998)) ("Thus, for the tort of bad-faith refusal to pay, '[r]equirements (a) through (d) represent the "normal" case. Requirement (e) represents the "abnormal" case.'"); *see also Cole*, 326 F. Supp. 3d at 1330-31.

"Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial." *Brechbill*, 144 So. 3d at 258.   Thus, "[t]he existence of an insurer's lawful basis for denying a claim is *a sufficient condition* for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Brechbill*, 144 So. 3d at 258 (emphasis in original).   An insurer who presents a "debatable reason" for denying a claim can avoid bad faith liability even if the insured identifies some deficiencies in the insurer's investigatory process.   *Id.* at 259 (citing *Weaver v. Allstate Insurance Co.*, 574 So. 2d 771, 775 (Ala. 1990) (in turn quoting *State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874, 877 (11th Cir. 1990))); *see also Coleman v. Unum Grp. Corp.*, 207 F. Supp. 3d 1281, 1284 (S.D. Ala. 2016) ("The *Brechbill* decision makes clear that the conditional fifth element is a potential substitute for the fourth element, but not for the third element, which the plaintiff must prove in every case.").

Thus, in the present case, Walker must prove that LINA lacked any legitimate, arguable, or debatable reason for terminating her benefits under the LTD and Life policies, in particular pursuant to the following directive:

> The Supreme Court of Alabama has emphasized the "heavy burden" a plaintiff asserting a bad-faith claim bears:
>
>> The plaintiff asserting a bad-faith claim bears a heavy burden.  To establish a prima facie case of bad-faith refusal to pay an insurance claim, a plaintiff must show that the insurer's decision not to pay was without any ground for dispute; in other words, the plaintiff must demonstrate that the insurer had no legal or factual defense to the claim. The insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.
>
> *Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (internal citations and quotation marks omitted).  For a plaintiff to make out a *prima facie* case of bad-faith refusal to pay in the "normal" case, "the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *Nat. Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

*Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-JEO, 2016 WL 3876440, at *6-7

(N.D. Ala. June 20, 2016), *report and recommendation adopted sub nom. Progressive Specialty Ins.*

*Co. v. Hall*, No. 2:14-CV-02047-RDP, 2016 WL 3854232 (N.D. Ala. July 15, 2016).[16]

---

[16] Walker asserts two non-meritorious arguments against application of the directed verdict standard. First, she asserts she has not moved for a directed verdict, but the case law does not require an actual directed verdict motion.   Rather, the court must consider whether the evidence currently in the record would entitle Walker to a directed verdict.   *See Loyal Am. Life Ins. Co. v. Mattiace*, 679 So. 2d 229, 235 n.2 (Ala. 1996) ("Further, the trial court need not expressly direct a verdict in favor of the plaintiff on a breach of contract claim in order to submit a bad faith claim to the jury.   The trial court must simply determine that the plaintiff has met the standard of proof required for a directed verdict.").

Second, Walker argues the directed verdict standard does not apply in an "abnormal" bad faith claim. Walker's argument reflects an accurate but incomplete statement of the law.

> The "directed verdict" standard does not apply in all cases; it does not apply in the "abnormal" case in which the plaintiff produces "substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306-07 (Ala. 1999). In either case, however, the plaintiff must establish the third element of bad faith – namely, the absence of a legitimate basis for denial. *See Brechbill*, 144 So. 3d at 258 ("Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial.").

*Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-JEO, 2016 WL 3876440, at *6-7 (N.D. Ala. June 20, 2016), *report and recommendation adopted sub nom. Progressive Specialty Ins. Co. v. Hall*, No. 2:14-CV-02047-RDP, 2016 WL 3854232 (N.D. Ala. July 15, 2016).   Thus, while the court may not apply the directed verdict standard in evaluating the fifth element of an "abnormal" bad faith claim, it must apply the standard in evaluating the third element, which a plaintiff must prove in both "normal" and "abnormal" bad faith cases.

Here, as the court previously held, genuine disputes of material facts preclude the entry of judgment as a matter of law in favor of either party on Walker's breach of contract claim.  Thus, the evidence would not entitle Walker to a directed verdict on that claim. *See Smith Lake Marina & Resort LLC v. Auto-Owners Ins. Co.*, No. 5:16-CV-01104-AKK, 2017 WL 4167448, at *3 (N.D. Ala. Sept. 20, 2017) (citing *Thomas v. Principal Fin. Grp.*, 566 So. 2d 735, 745 (Ala. 1990)) ("As a preliminary matter, a bad faith claim generally cannot succeed 'if the evidence produced by either side creates a fact question with regard to the [breach of] contract claim.'"); *Weisberg v. Guardian Life Ins. Co. of Am.*, No. 2:16-CV-00568-AKK, 2017 WL 5140547, at *6 (N.D. Ala. Oct. 24, 2017) (citing *Brechbill,* 144 So. 3d at 255; *Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1155 (Ala 2001)) ("Given the extremely high threshold necessary to establish a bad faith claim under Alabama law, the fact that the court cannot grant summary judgment on any of Dr. Weisberg's breach of contract claims strongly indicates that an arguable basis existed for Guardian to deny those claims.").

Moreover, LINA produced evidence of legitimate, arguable, or debatable reasons for terminating Walker's benefits under the LTD Policy and denying her WOP benefits under the Life Policy.  LINA terminated Walker's LTD benefits based on Dr. Lundquist's May 28, 2014, opinion that Walker could perform sedentary work, which Dr. Lundquist reached after reviewing of all of Walker's medical records, including

61

Teague's January 7, 2013, FCE and Dr. Neighbors' April 11, 2013, RFC Questionnaires. LINA also relied upon Loris's TSA, which found Walker could perform occupations existing in her local labor market.

LINA based its decision to deny Walker's appeal regarding her LTD benefits on Matzek's September 2, 2014, FCE, which concluded Walker could perform sedentary work; Dr. Knapp's December 8, 2014, report, which, after a review of all of Walker's medical records and conversations with Walker's treating physicians, concluded Walker did not require any work restrictions; and Norris's November 6, 2014, TSA, which concluded Walker could perform occupations in her local labor market.

LINA based its decision to deny Walker's WOP benefits on Teague's January 7, 2013, FCE and Featherston's July 3, 2013, TSA, which concluded Walker could perform occupations existing in her local labor market.  LINA based its decisions to deny Walker's appeals regarding her WOP benefits on Dr. Jacobson's report, which involved a comprehensive review of Walker's medical records and concurred with the January 7, 2013, FCE; Dr. Lundquist's May 28, 2014, report; Norris's June 3, 2014, TSA, which found Walker could perform occupations in her local labor market; and Dr. Knapp's December 8, 2014, report.

Other judges within this district have consistently held that an insurer establishes a legitimate, arguable, or debatable reason for denying a disability claim when it bases

the denial decision on medical and other expert opinions that the claimant could work. *See Weisberg*, 2017 WL 5140547, at *7 (holding that an insurer possessed an arguable basis to deny a disability claim when several doctors opined the insured had not suffered sufficient injuries to cause a reduction in his income); *Duquette v. Nat'l Life Ins. Co.,* No. 2:15-CV-0316-RDP, 2016 WL 4247791, at *6 (N.D. Ala. Aug. 11, 2016) ("The medical expert testimony opining that degenerative disc disease caused Plaintiff's total disability constitutes at least a legitimate or arguable reason for denying Plaintiff's total disability claim."); *Bailey v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. 1:12-CV-4206-KOB, 2015 WL 1883725, at *8 (N.D. Ala. Apr. 24, 2015) ("In the present case, National Union had a 'legitimate or arguable' reason for refusing to pay Mr. Bailey Continuous Total Disability Benefits at the time it denied his claim because several health experts had concluded that Mr. Bailey was capable of performing sedentary work.").    The undersigned finds those decisions persuasive.

Because Walker cannot demonstrate LINA lacked a legitimate, arguable, or debatable reason for terminating her benefits under the LTD and Life Policies, she cannot prove the third element of a bad faith claim under Alabama law.  Because Walker cannot prove the third element, the court need not consider whether she can prove the fifth element by establishing LINA's intentional failure to determine whether there existed a legitimate or arguable reason for terminating her benefits.  *See Brechbill*,

144 So. 3d at 257-58.   Therefore, evidence regarding deficiencies in LINA's investigatory process does not materially affect the outcome of LINA's motion for summary judgment.   *See id.* at 259 (holding that an insurer who presents a "debatable reason" for denying a claim can avoid bad faith liability even if the insured identifies some deficiencies in the insurer's investigatory process).[17]

Walker argues that LINA's "failure to fully investigate claims can result in the lack of a reasonable or legitimate basis for terminating benefits to be inferred or imputed." (Doc. 128-1, at 29).   For her contention, Walker relies on the following language from the Alabama Supreme Court's decision in *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968 (Ala. 1998):   "A defendant's knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured."   *Id.* at 976 (citing *Gulf Atlantic Life Ins. Co. v. Barnes,* 405 So. 2d 916, 924 (Ala. 1981)).

The foregoing quote establishes that a failure to adequately investigate claims may support the *fourth* element of a bad faith cause of action – *i.e.,* that the insurer *knew*

---

[17] Similarly, because Harwood's expert report solely addresses LINA's failure to conduct an adequate investigation, the court does not need to consider Harwood's report.

it lacked a legitimate or arguable basis for denying the insurance claim.  But the Alabama Supreme Court unequivocally clarified in *Brechbill* that a failure to adequately investigate claims cannot take the place of the *third* element of a bad faith claim.  S*ee Coleman*, 207 F. Supp. 3d at 1284 ("The *Brechbill* decision makes clear that the conditional fifth element is a potential substitute for the fourth element, but not for the third element, which the plaintiff must prove in every case."); *Coleman v. Unum Grp. Corp.*, No. CV 15-0367-WS-M, 2016 WL 5539625, at *2 (S.D. Ala. Sept. 28, 2016) ("To the extent the plaintiff is suggesting that the existence of a debatable reason is fatal to a claim of abnormal bad faith but that the absence of a debatable reason can be inferred from a flawed investigation, he again confronts *Brechbill*. As the Court noted in its previous order . . ., **"Alabama law is clear: . . . regardless of the imperfections of [the insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim."**) (alteration and emphasis in original).

Walker also argues that an ambiguity in the language of the Life Policy supports her claim for "abnormal" bad faith denial of benefits under that policy, regardless of whether she can satisfy the third element of the bad faith claim. As an initial matter, Walker has identified a governing legal principle:

> Alabama courts have repeatedly stressed that insurers may not rely on an ambiguous policy term to deny coverage. *See e.g., Blackburn v. Fid. & Deposit Co.,* 667 So. 2d 661, 669 (Ala. 1995); *Employees' Benefit Ass'n v. Grissett,* 732 So. 2d 968, 976-77 (Ala. 1998).   The oft-cited reason for this rule is that "if an insurer's subjective interpretation of an insurance policy could create the fairly debatable reason needed to defend a bad faith claim, then insurers would be encouraged to write ambiguous insurance policies." *Blackburn,* 667 So. 2d at 669.

*Phillips v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 6:12-CV-02757-LSC, 2013 WL 5974906, *7 (N.D. Ala. Oct. 30, 2013).

Yet, Walker's argument misses the mark because the Life Policy does not contain an ambiguity.   "A term in a contract is ambiguous only if, *when given the context,* the term can reasonably be open to different interpretations by people of ordinary intelligence." *Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1098 (Ala. 2016) (emphasis in original) (citing *Lambert v. Coregis Ins. Co.,* 950 So. 2d 1156, 1162 (Ala. 2006); *Safeway Insurance Co. of Alabama v. Herrera,* 912 So. 2d 1140 (Ala. 2005)).   Reasonable people could not reach differing conclusions as to whether the terms of the Life Policy contradict each other.   Rather, the Life Policy contains two different definitions of "disability" for two different levels, or stages, of benefits.

To initially qualify for temporary EDB under the Life Policy, Walker needed to prove she could not perform the material duties of her own occupation.   She satisfied that definition, just as she satisfied the identical definition of disability to entitle her to

24 months of LTD benefits.  Therefore, under the EDB provision, Walker received life insurance benefits without paying premiums during the nine-month Waiver Waiting Period after she ceased working in October 2012.  After the nine-month Waiver Waiting Period expired, Walker needed to satisfy a stricter definition of disability by proving she could not perform the material duties of *any* occupation to continue receiving life insurance benefits without paying premiums under the WOP provision.

There exists no question which definition of disability applied under which circumstances.  EDB covered only a temporary, nine-month period after the employee ceased working, and eligibility for EDB required proof of only the lower, "own occupation" definition of disability.  WOP benefits commenced after the nine-month Waiver Waiting Period expired, and those benefits could extend until Walker reached age 65.  Eligibility for WOP benefits required proof of the stricter, "any occupation" definition.  LINA found Walker satisfied the first definition, but not the second.  No ambiguity existed.

Despite her arguments to the contrary, Walker's inability to prove LINA lacked a legitimate, arguable, or debatable reason for terminating her insurance benefits proves fatal to her bad faith claim.  Therefore, the court will enter summary judgment in LINA's favor on that claim.

### III.   Walker Cannot Recover Attorney's Fees Because She Cannot Demonstrate LINA's Defenses Lack Substantial Justification

Walker's Second Amended Complaint requests an award of attorney's fees for both her breach of contract claim and her bad faith claim.   (Doc. 86, ¶¶ 124, 131, 133) ("Ms. Walker seeks judgment against LINA for . . . attorney's fees . . . . Ms. Walker requests the Court award her reasonable attorneys' fees and costs incurred.").   Because Walker's bad faith claim will not survive summary judgment, the court must only determine whether Walker can receive attorney's fees on her breach of contract claim.

"Under Alabama law, attorney fees are recoverable from an opposing party only when provided for by contract or by statute." *Ex parte Odem*, 537 So. 2d 919, 920 (Ala. 1988) (citing *Taylor v. White*, 237 Ala. 630, 188 So. 232 (Ala. 1939); *Cincinnati Ins. Co. v. City of Talladega,* 342 So. 2d 331 (Ala. 1977); *George E. Jensen Contractor, Inc. v. Quality Mill Works, Inc.,* 431 So. 2d 1232 (Ala. 1983)).   Neither of the insurance contracts at issue in this case provides for an award of attorney's fees to an insured who sues to recover benefits.   However, Walker claims entitlement to fees under the Alabama Litigation Accountability Act ("ALAA"), Ala. Code § 12-19-270 et seq.:

> The legislature enacted the ALAA in 1987 to deter baseless legal action. *See Pacific Enters. Oil Co. (USA) v. Howell Petroleum Corp.,* 614 So.2d 409, 417 (Ala. 1993).   To effectuate this purpose, the ALAA provides, in pertinent part:

> "[I]n any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorneys' fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, or interposed a defense, that a court determines to be without substantial justification, either in whole or part. . . ."
>
> § 12-19-272(a), Ala. Code 1975.  Section 12-19-271(1) provides that for an action, claim, defense, or appeal to be "without substantial justification," it must be "frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court."

*Ex parte Loma Alta Prop. Owners Ass'n, Inc.*, 52 So. 3d 518, 522 (Ala. 2010).

The court cannot characterize LINA's defenses to Walker's breach of contract claim as "frivolous," "groundless," or "vexatious," because LINA presented medical and vocational evidence to justify its decisions to terminate Walker's LTD benefits and to deny her WOP benefits.  Even though Walker disagrees with LINA's conclusions and has presented contrary evidence to support her disability claims, the court declined to grant summary judgment in favor of either party.  That decision indicates the presence of genuinely disputed material facts, not frivolity.  *See Adams v. Austal, U.S.A., L.L.C.*, 503 F. App'x 699, 702 (11th Cir. 2013) (quoting *Head v. Medford,* 62 F.3d 351,

355-56 (11th Cir. 1995)) ("Where plaintiffs introduced evidence sufficient to support their claim[s], findings of frivolity generally do not stand.").[18]

## IV.   Walker Cannot Recover Punitive Damages Because Only Her Breach of Contract Claim Survives Summary Judgment

Walker's Second Amended Complaint also requests an award of punitive (or "exemplary") damages for both her breach of contract claim and her bad faith claim. (Doc. 86, ¶¶ 124, 131) ("Ms. Walker seeks judgment against LINA for . . . exemplary relief as determined by a jury at trial . . . ."). A successful plaintiff may receive punitive damages for a bad faith claim, but not for a breach of contract claim. *See Boyd v. Homes of Legend, Inc.*, 188 F.3d 1294, 1299 (11th Cir. 1999) (citing *Geohagan v. General Motors Corp.,* 291 Ala. 167, 279 So.2d 436, 438 (1973)) ("Under Alabama common law, punitive damages are not recoverable for breach of contract."); *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 925 (Ala. 1981) ("Because the violation of the duty of good faith and fair dealing is tortious in nature, punitive damages as well as compensatory damages are recoverable in the proper case."). Because only Walker's breach of contract claim survives summary judgment, she cannot recover punitive damages.

---

[18] The *Adams* case involved a claim for attorney's fees under 42 U.S.C. § 1988, which, like a bad faith claim under Alabama law, requires a showing that a party asserted a frivolous claim or defense. *See Adams*, 503 F. App'x at 702.

70

## CONCLUSION AND ORDER

Based on the foregoing analyses, the court finds genuine disputes of material facts as to whether Walker can satisfy the applicable definition of disability prevent the entry of summary judgment in either party's favor on Walker's breach of contract claim. Therefore, the court **DENIES** LINA's motion for summary judgment as to breach of contract.  The breach of contract claim will proceed to trial, and the court will set a pretrial conference by separate order.

Because Walker cannot prove that LINA's decisions to terminate Walker's LTD benefits and deny her WOP benefits lacked an arguable basis, the court **GRANTS** LINA's motion for summary judgment as to bad faith, and **DISMISSES** Walker's bad faith claim with prejudice.  The court also **GRANTS** LINA's motion for summary judgment as to attorney's fees and punitive damages, and **DISMISSES** all claims for attorney's fees and punitive damages.

**DONE** and **ORDERED** this 19th day of May, 2020.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

71